UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

```
_____
                                  )
MICHAEL J. KAMEISHA,              )
                                  )
            Plaintiff,            )
                                  )
        v.                        )          CIVIL ACTION
                                  )          NO. 5:12-cv-01324-WGY
CAROLYN W. COLVIN,¹               )
Acting Commissioner of Social     )
Security,                         )
                                  )
            Defendant.            )
                                  )
_____
```

YOUNG, D.J.[2]                                       April 2, 2015

<u>MEMORANDUM AND ORDER</u>

## I.    INTRODUCTION

This is an action under section 405(g) of the Social

Security Act, 42 U.S.C. § 405(g).  Compl. 1, ECF No. 1.  Michael

J. Kameisha ("Kameisha") is seeking judicial review of the final

decision of the Commissioner of the Social Security

Administration (the "Commissioner") denying him Social Security

Disability ("SSD") benefits.  <u>Id.</u>  Kameisha claims that the

---

[1] Michael J. Astrue was originally the named defendant in
his capacity as the Commissioner of the Social Security
Administration.  On February 14, 2013, Carolyn W. Colvin became
the Acting Social Security Commissioner and has therefore been
substituted as the named defendant pursuant to Federal Rule of
Civil Procedure 25(d). Elec. Clerk's Notes, June 28, 2013.

[2] Of the District of Massachusetts, sitting by designation.
Reassignment Order, ECF No. 13.

decision of the Administrative Law Judge (the "hearing officer")
denying him benefits was not based on substantial evidence. Id.
Specifically, Kameisha alleges that the hearing officer did not
correctly assess his residual functional capacity ("RFC") and
credibility and that the Commissioner did not meet her burden of
proving that Kameisha was able to perform other work existing in
significant numbers in the national economy. Pl.'s Mem. Law
Supp. Mot. J. Admin. R. & Pleadings Pursuant Rule 12(C) F.R.C.P.
("Kameisha's Mem.") 1, ECF No. 11. Kameisha, therefore,
requests that this Court reverse the hearing officer's decision
or, alternatively, remand the case for a new hearing. Id. at
15. The Commissioner, on the other hand, requests that this
Court affirm her decision denying Kameisha social security
benefits. Mem. Law Supp. Comm'r's Mot. J. Pleadings ("Def.'s
Mem.") 1, ECF No. 12.

**A.    Procedural Posture**

Kameisha applied for SSD benefits on March 31, 2011. Soc.
Sec. Admin. R./Tr. ("Admin. R.") 150-58, ECF No. 9.[3] The Social
Security Administration (the "Administration") denied his
application on July 15, 2011. Id. at 68-73. Kameisha requested
a hearing, which took place on March 1, 2012. Id. at 29-66.

---

[3] The continuously paginated administrative record is split
across several parts on this case's docket. In the interest of
clarity of presentation, this memorandum will cite simply to the
page numbers of the record itself without reference to the
different ECF numbers.

The hearing officer denied Kameisha's application for SSD benefits on April 5, 2012. Id. at 16-25. On July 5, 2012, the Appeals Council denied Kameisha's request to review the hearing officer's decision. Id. at 1-6. The hearing officer's decision, therefore, became the final decision of the Commissioner. Id. at 1.

On August 24, 2012, Kameisha filed a complaint under 42 U.S.C. section 405(g) seeking review of the Commissioner's decision, Compl., to which the Commissioner filed an answer on December 10, 2012, Def.'s Answer, ECF No. 8. On January 25, 2013, Kameisha filed a memorandum of law in support of his complaint, Kameisha's Mem., and the Commissioner filed her memorandum on March 11, 2013, Def.'s Mem.[4] On June 25, 2013, the case was reassigned to this Court. Reassignment Order, ECF No. 13.

### B. Factual Background

Kameisha was born on June 19, 1954. Admin. R. 152. His past work experience consists of employment as a landscaper from 1980 to 1991, as a delivery man from 1991 to 1992, and as a janitor from 1992 through 2003. Id. at. 180. In 2003, Kameisha

---

[4] In accordance with the Northern District of New York's General Order 18 governing appeals from decisions of the Social Security Administration, this Court treats the parties' memoranda of law as though "both parties had accompanied their briefs with a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure." Social Security Action – Case Assignment Form 3, ECF No. 3.

stopped working due to problems with his left arm.  Id. at 21, 46.

### 1.  Medical Evidence

Kameisha was diagnosed with HIV in 1991.  Id. at 227.  As explained at his hearing, he is on HIV medication and a methadone program.  Id.  As determined by blood tests conducted in September 2006, Kameisha's HIV viral load was less than 50 copies/mL.  Id. at 235.

Kameisha started treatment at Camden Medical Care on October 12, 2006, when he saw Dr. Muftah Kadura, M.D. ("Dr. Kadura") for sores on his legs.  Id. at 226, 231.  Dr. Kadura reported that Kameisha was HIV positive and hepatitis C negative, had an arthritic left knee, and had arthritic ribs on the left side.  Id. at 231.  Dr. Kadura also noted that Kameisha's HIV viral load was below detectable levels.  Id. at 226.  On December 19, 2006, Kameisha still complained about the sores on his legs.  Id. at 230.  Dr. Kadura prescribed him medications and referred him to pain management.  Id.  In February and March 2007, Kameisha continued treatment with Dr. Kadura for his HIV and his back pain.  Id. at 228-29.

On July 3, 2008, Kameisha consulted Dr. Smita Kittur, M.D. ("Dr. Kittur"), complaining of left arm pain and muscle weakness with no joint pain.  Id. at 236-38.  Kameisha told Dr. Kittur that he had no back pain and no difficulty walking.  Id. at 237.

4

Kameisha also said he independently performed his activities of daily living but had difficulty using his left arm. Id. Dr. Kittur observed that Kameisha's HIV was stable and that his viral load was below the detectable level. Id. at 236. Dr. Kittur also noted that Kameisha's gait and station were normal. Id. at 238. Kameisha demonstrated full muscle strength in his right arm and right leg but was unable to raise his left arm up, though he could hold it up if his arm was brought up to ninety degrees. Id. Kameisha reported to Dr. Kittur that in the weeks prior to the examination, he could not get his left hand to carry a grocery bag, could not lift his left hand above his head, had left shoulder pain, and had pain in the left hand mainly in the third and fourth fingers. Id. at 236. Kameisha also told Dr. Kittur that his whole hand felt numb, that his pain in the hands was like a cramping pain, and that taking a shower was difficult. Id. Dr. Kittur noted to rule out cervical myelopathy, cervical radiculopathy C5-C6, and HIV neuropathy and myopathy. Id. at 238.

Dr. Peter Berkey, M.D. ("Dr. Berkey") treated Kameisha intermittently. Id. at 247. On March 17, 2009, Dr. Berkey diagnosed Kameisha with HIV infection, weakness of the left arm with unclear etiology, and hepatitis C with a status post interferon therapy. Id. Blood tests conducted that month revealed that Kameisha's viral load was less than 48 copies/mL,

which was too low to be quantified but above the lower limit for detection. Id. at 253. On April 14, 2010, Kameisha returned to Dr. Berkey, who noted that Kameisha had HIV infection, methadone maintenance, a history of herpes simplex infection in the left eye, and hepatitis C with a status post interferon therapy. Id. at 249.

On February 9, 2012, an x-ray of Kameisha's cervical spine showed moderate degenerative disc disease at C5-C6 and minimal degenerative change at C6-C7 and C4-C5. Id. at 242. On February 13, 2012, an MRI of Kameisha's cervical spine showed the following: C3-C4 large disc bulge with mass effect on the spinal cord and intrinsic intramedullary cord edema, plus moderate central canal stenosis and moderate to severe left neural foraminal stenosis; C4-C5 large disc bulge with central and left paracentral disc protrusion yielding direct mass effect on the ventral cord, plus mild malacia and marked cord edema intrinsically with severe central canal stenosis and severe bilateral neural foraminal stenosis; C5-C6 posterior disc osteophyte complex with a large left paracentral disc protrusion, plus direct mass effect on the ventral margin of the spinal cord with marked intrinsic cord parenchymal edema and myelomalacia with severe central canal stenosis and severe bilateral neural foraminal stenosis; C6-C7 trace disc bulge with canal and neural foraminal stenosis; C7-T1 foraminal stenosis;

and multilevel degenerative facet joint arthropathy.  Id. at
244.

### 2.  Kameisha's Hearing Testimony

At the March 2012 hearing, Kameisha declared that he had
been diagnosed with HIV approximately twenty years ago.  Id. at
36.  He testified that his last job was at a synagogue and that
he stopped working in 2003.  Id. at 37-38.  At the synagogue,
Kameisha was responsible for "setting up classrooms," tearing
them down, and setting them up again.  Id. at 38-39.  Kameisha
was also in charge of the "regular maintenance on the building,
vacuuming, [washing] floors, [and] stripping the wax."  Id. at
39.  Kameisha stated that his days were between seven and twelve
hours long and that he had to stay "pretty much on [his] feet
the whole time."  Id. at 39-40.  After working the first three
or four years by himself, Kameisha supervised the people hired
by the synagogue to help him because he could no longer get the
work done alone.  Id. at 40.  Kameisha then declared that the
synagogue let him go and that he began living on unemployment
benefits.  Id. at 41.  Because his location at the time was too
expensive, he moved to a trailer home in upstate New York.  Id.
Describing a typical day, Kameisha described going to "the
[m]ethadone clinic, driv[ing] home, and . . . pretty much
sit[ting] in front of a television for the rest of the day."
Id. at 42-43.  Kameisha testified that he lives alone, cooking

by "pushing buttons on the microwave" and doing laundry.  Id. at 43.  Kameisha stated that he has a neighbor shovel the snow when needed.  Id. at 44.

Identifying his disabling impairments, Kameisha said that due to his smoking and drug use, he quickly gets out of breath. Id. at 45-46.  Kameisha also stated that although he could hold objects with his left hand, he could not raise his left arm above his chest.  Id. at 46.  Kameisha asked Dr. Berkey about his left hand but did not go to the neurologist as recommended because he could not afford to "stick around two days in Yonkers for an appointment."  Id.  Kameisha made an appointment with Dr. Kadura, who recommended an MRI, but his "insurance was with Dr. Berkey in Yonkers, so [he] kept putting that off."  Id. Kameisha then declared that he went back to Dr. Kadura about his arm when preparing his file for disability benefits.  Id. at 46-47.  Dr. Kadura sent Kameisha "to get an X-ray on [his] arm." Id. at 47.  Kameisha testified that Dr. Kadura told him that there was not much wrong with his left arm and prescribed him mild pain medication.  Id.  Kameisha declared that he went to see another doctor and got "the MRI's and X-rays done on [his] arm and back about a month ago."  Id. at 48.  Answering a question from his attorney about supporting himself financially without any income, Kameisha stated that his brother had been helping him.  Id. at 49.

8

The hearing officer asked Kameisha why he needed methadone. Id. at 52. Kameisha testified that he went to a methadone clinic to deal with his cocaine addiction but that he then "ended getting up hooked on [m]ethadone." Id. He declared to the hearing officer that he was still on methadone and that he has "been upping it over the [past] six years" for pain. Id. at 53. The hearing officer then inquired about Kameisha's HIV, and Kameisha testified that it had stabilized. Id. at 54. The hearing officer also asked if Kameisha had any side effects from the methadone. Id. at 55. Kameisha replied that he did not know what side effects methadone could bring but that felt fatigue, lack of coordination, and numbness in his extremities. Id. at 56. Responding to the hearing officer about his breathing problems, Kameisha declared that he would get them when he was stressed out. Id. Kameisha also confirmed to the hearing officer that he was still smoking but that he had switched to ultra light cigarettes and had "gone from two pack[s] a day to about a half a pack a day." Id. at 57. Finally, the hearing officer asked Kameisha how he thought his condition was now compared to 2008. Id. Kameisha testified that it was "easily the same." Id. at 58.

### 3. Vocational Expert's Testimony

At the 2012 hearing, the hearing officer examined Dr. James Newton ("Newton") as the vocational expert on Kameisha's case.

At the hearing officer's request, Newton considered the situation of a hypothetical individual of the same age, educational background and work experience as Kameisha who: is limited to the light exertional category of work and to "simple, routine, and repetitive tasks"; "can only occasionally utilize his left lower extremity for pushing, pulling and operation of foot controls, and can only occasionally utilize his left upper extremity for pushing, pulling, . . . and gross and fine manipulation"; cannot reach above chest level with his non-dominant left arm; and can occasionally stoop. Id. at 62. Newton then concluded that such an individual could perform the jobs of office helper, gate attendant, and ticker seller, each of which exists in significant numbers in the regional and national economy. Id. at 63.

The hearing officer also asked Newton to consider another hypothetical individual with "no effective use of the non-dominant left upper extremity." Id. at 63-64. Newton testified that such an individual could perform all the jobs previously identified in the first hypothetical. Id. at 64. Kameisha's representative then asked Newton if the answer would be the same if the individual had the additional limitation of being "off task [twenty] percent of the time." Id. Newton testified that such individual would not be able to perform those occupations. Id.

## II.  LEGAL STANDARD

### A.  Standard of Review

A federal district court may affirm, modify, or reverse a decision of the Commissioner assessing a claimant's eligibility for SSD benefits.  42 U.S.C. § 405(g).  During the course of this review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  Id.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).  This standard, therefore, requires the Court to uphold the hearing officer's findings "[e]ven where the administrative record may also adequately support contrary findings on particular issues, . . . so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

### B.  Social Security Disability Standard

A claimant is deemed disabled for the purposes of SSD benefits if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The Administration has promulgated a five-step sequential

procedure for the hearing officer to apply when determining

whether an applicant is disabled.  20 C.F.R. § 404.1520(a)(4).

The hearing officer will therefore evaluate:

> (1) [W]hether the claimant is engaged in
> substantial gainful activity;
> (2) whether the claimant has a severe
> impairment;
> (3) whether the impairment meets or
> medically equals an impairment listed under
> 20 C.F.R. Part 404, Subpart P, Appendix 1,
> and meets the duration requirement;
> (4) whether the claimant has the residual
> functional capacity to perform his past
> relevant work; and
> (5) whether the impairment prevents the
> claimant from doing any other work,
> considering the claimant's age, education,
> and work experience.

Deno v. Colvin, No. 8:12-cv-01263-WGY, 2014 WL 5315108, at *12

(N.D.N.Y. Oct. 20, 2014) (citing 20 C.F.R. § 404.1520(a)(4)).

The claimant bears the burden of proof of his disability in the

first four steps.  Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir.

2004).  This burden shifts to the Commissioner at the last step.

Id.

**III. THE HEARING OFFICER'S DECISION**

The hearing officer applied the five-step analysis and

ultimately decided that Kameisha was not disabled.  Admin. R.

20-21.  At the first step, the hearing officer noted that

Kameisha had not engaged in substantial gainful activity since

the date of the alleged onset of his disability, September 30,

2003, to the date last insured, December 31, 2008. Id. at 21.

Proceeding to the second step, the hearing officer determined

that Kameisha had two severe impairments: an impaired left upper

extremity and atrophy of the left deltoid muscle. Id. At the

third step, the hearing officer observed that Kameisha's

impairments did not meet or medically equal one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id.

at 22. Prior to moving to the fourth step, the hearing officer

determined that Kameisha:

> [H]ad the residual functional capacity to
> perform light work as defined in 20 C.F.R.
> 404.1567(b) except he could only
> occasionally utilize his left lower
> extremity for pushing, pulling, and
> operation of foot controls, could not reach
> above chest level with his non-dominant left
> upper extremity, could only occasionally
> utilize his left upper extremity for
> pushing, pulling, reaching generally, and
> gross and fine manipulation, and could only
> occasionally engage in stooping. In
> addition, he was limited to performing
> simple, routine, and repetitive tasks as a
> result of his impairments and medication
> side effects.

Id. at 22. At the fourth step, the hearing officer noted that

Kameisha was unable to perform any past relevant work. Id. at

24. Finally, the hearing officer found that there were jobs in

significant numbers in the national economy that Kameisha could

perform. Id. Therefore, the hearing officer concluded that

Kameisha was not disabled from September 30, 2003, the alleged

onset date, through December 31, 2008, the date last insured.
Id. at 25.

## IV. ANALYSIS

Kameisha contests the hearing officer's decision on three different grounds. First, Kameisha argues that the hearing officer failed to develop the record, leading to an improper evaluation of Kameisha's RFC. Kameisha's Mem. 7–11. Second, Kameisha contends that the hearing officer did not properly assess his credibility. Id. at 11–14. Finally, Kameisha claims that the vocational expert's testimony did not constitute substantial evidence, and therefore the Commissioner did not meet her burden of proving that Kameisha was able to perform other work existing in significant numbers in the national economy. Id. at 14–15.

### A. Development of the Record and Assessment of the Residual Functional Capacity

Kameisha alleges that the hearing officer failed to develop the record when he did not order a consultative examination and did not consider a treating source's retrospective opinion, leading to a flawed assessment of Kameisha's RFC. Id. at 7. More specifically, Kameisha claims that the hearing officer erred in not taking into account medical evidence of degenerative disease dated after December 31, 2008, Kameisha's last insured date. Id. The Commissioner asserts that the

hearing officer correctly determined Kameisha's RFC. Def.'s Mem. 9.

A hearing on disability benefits is a non-adversarial proceeding, and the hearing officer "generally has an affirmative obligation to develop the administrative record." Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); see also 20 C.F.R. § 404.1512(d). The hearing officer retains this obligation even if the claimant is represented by counsel. Perez, 77 F.3d at 47. Kameisha argues that the significant gap in his medical record regarding "the nature and the severity of [his] impairments prior to his date last insured" required the hearing officer to develop the record. Kameisha's Mem. 11. According to Kameisha, this error of the hearing officer had adverse consequences for the remaining steps of the disability assessment. Id.

First, Kameisha claims that the hearing officer was oblgiated to consider the results of the February 13, 2012 MRI that presented evidence of a degenerative condition. Id. at 8. The hearing officer, however, considered an x-ray taken just a few days before, on February 9, 2012, in his assessment of the medical record and of Kameisha's impairments. See Admin. R. 22, 215. Like the MRI, the x-ray mentions the degenerative disc disease, though with less detail. Id. at 242-244. As the Commissioner correctly argues, this examination happened more

15

than three years after the date last insured, whereas before that date, Kameisha had declared to Dr. Kittur that he did not have joint or back pain. See Def.'s Mem. 11; see also Admin. R. 237. The hearing officer, who is responsible for weighing the evidence, Richardson, 402 U.S. at 399, decided based on the timing of this evidence that Kameisha's degenerative condition was "not manifested until after his date last insured." Admin. R. 22. This Court declines to interfere with that reasonable view of the record.

Second, Kameisha contests the hearing officer's decision not to order a consultative examination. Kameisha's Mem. 7. The relevant regulations stipulate that a consultative examination is ordered at the Administration's request, on an individual case basis, and when appropriate. See 20 C.F.R. § 404.1519; see also 20 C.F.R. § 404.1517. If the evidence in the record is sufficient to render a decision on the claimant's disability, a hearing officer is not required to order a consultative examination. See 20 C.F.R. § 404.1517. The hearing officer determined that he did not need additional medical evidence to make an informed assessment and that a "consultative exam would be unenlightening as to [Kameisha]'s condition over [three] years ago," the last date for which he would be able to receive any benefits. Admin. R. 19. This Court rules that the hearing officer was reasonable in deciding

that he had sufficient evidence to assess Kameisha's disability status.  Moreover, it strikes the Court as correct to say that a new consultative examination would shed little light on Kameisha's past disability.

Finally, as required, see 20 C.F.R. § 404.1512(d), the Administration contacted Kameisha's treating physician, Dr. Berkey, for his medical reports, Admin. R. 189.  On July 1, 2011, a state agency disability examiner called Dr. Berkey and requested Kameisha's medical records.  Id.  Four days later, the Administration had still not received the records and followed up with another phone call to Dr. Berkey's office.  Id. Therefore, this Court determines that the hearing officer respected his duty to develop the record, contacting Kameisha's physician and justifying his consideration of the medical evidence and the consultative examination.  The hearing officer has, accordingly, properly assessed Kameisha's RFC.

**B.    Correct Evaluation of Kameisha's Credibility**

Kameisha claims that the hearing officer did not apply the appropriate legal standards when evaluating his credibility. Kameisha's Mem. 11.  According to the Commissioner, the hearing officer correctly determined that Kameisha's statements were inconsistent with his own RFC assessment.  Def.'s Mem. 12.

**1.    Credibility Evaluation Standard**

When assessing the claimant's RFC, the hearing officer considers the objective evidence and "the claimant's reports of pain and other limitations." Genier, 606 F.3d at 49. The hearing officer "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Id. (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)).

The evaluation of a claimant's allegations of subjective pain follows a two-step method. Id. First, the hearing officer determines "whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." Id. (citing 20 C.F.R. § 404.1529(b)). Second, the hearing officer decides "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." Id. (alteration in original) (quoting 20 C.F.R. § 404.1529(a)) (internal quotation marks omitted). The hearing officer will consider several factors in his assessment of the claimant's subjective claims of pain. See 20 C.F.R. § 404.1529(c).

### 2. Kameisha's Credibility

At the first step, the hearing officer found that Kameisha had medically determinable impairments that could "reasonably be expected to cause certain of the alleged symptoms." Admin. R.

23.  Proceeding to the second step, the hearing officer
determined that Kameisha's "statements concerning the intensity,
persistence and limiting effects of these symptoms are not
credible to the extent they are inconsistent with the above
residual functional capacity assessment."  Id.  The hearing
officer explained his finding and detailed which elements of
Kameisha's allegations he considered credible.  He considered
Kameisha's statements regarding the limitations caused by his
left upper extremity impairment credible and integrated them in
the RFC assessment.  Id.  Regarding Kameisha's claim of back
pain and numbness caused by medication, the hearing officer gave
Kameisha the benefit of the doubt and incorporated additional
limitations to the RFC.  Id.  The hearing officer then observed
that Kameisha's alleged breathing problems and coordination
difficulties had no support in the medical record.  Id.  He also
noted that Kameisha "was independent in all activities of daily
living except for his upper extremity problems and other exams
were essentially normal."  Id.

     According to Kameisha, the hearing officer erred in
comparing Kameisha's subjective allegations of pain with the RFC
finding instead of the medical evidence.  Kameisha's Mem. 12.
This statement in the hearing officer's decision comes from a
decision template provided by the Commissioner and is widely
used by hearing officers across the country; the Commissioner

admits, however, that this statement has lead to criticism for
its ambiguity, especially in the Seventh Circuit. See Def.'s
Mem. 14; Bjornson v. Astrue, 671 F.3d 640, 644-46 (7th Cir.
2012); see also Gehm v. Astrue, No. 3:10-CV-1170, 2013 WL 25976,
at *5 & n.6 (N.D.N.Y. Jan. 2, 2013) (Nurd, D.).  Reading the
governing regulations and the case law of this Circuit, the
hearing officer ought indeed assess a claimant's credibility
with regard to the objective evidence and not his own
administrative determination of the RFC.  See 20 C.F.R. §
404.1529(a); Genier, 606 F.3d at 49.  Despite this ambiguous
statement, however, the hearing officer may still adequately
justify his assessment of the claimant's credibility with
respect to the rest of the evidence, as "this erroneous
boilerplate language does not merit remand if the [hearing
officer] offers specific reasons to disbelieve the claimant's
testimony."  Abdulsalam v. Comm'r of Social Sec., No. 5:12-cv-
1631(MAD), 2014 WL 420465, at *7 (N.D.N.Y. Feb. 4, 2014)
(D'Agostino, M.) (internal quotation marks omitted).

    Despite his use of this ambiguous statement, the hearing
officer, when evaluating Kameisha's credibility, properly
compared Kameisha's allegations with the objective evidence.
See Admin. R. 23.  The hearing officer explained his comparison
of each alleged limitation with the medical record, granting to
Kameisha credit for his left upper extremity impairment, the

benefit of the doubt for his back pain and numbness, and no credit for his breathing problems and coordination difficulties. Id. While recognizing the ambiguous language used in the hearing officer's decision, this Court concludes that the hearing officer's references to specific pieces of objective evidence in the record mean that his determination regarding Kameisha's credibility was supported by substantial evidence.

### C. Correct Reliance on Vocational Expert's Testimony

Kameisha claims that the vocational expert's testimony did not constitute substantial evidence. Kameisha's Mem. 14. This argument relies on Kameisha's prior contention regarding the hearing officer's failures to develop the administrative record and to adequately assess Kameisha's credibility. Id. According to Kameisha, the hypothetical questions asked to Newton did not include all of Kameisha's impairments. Id. Were that the case, the hearing officer's finding at the last of step of the disability's assessment would therefore not be supported by substantial evidence. Id.

This Court has determined that the hearing officer respected his duty to develop the administrative record and correctly evaluated Kameisha's credibility. The hearing officer's hypothetical to Newton was therefore complete with all of Kameisha's credible limitations. This Court concludes that

the hearing officer has discharged his duty at the last step and correctly assessed Kameisha as not disabled.

**V.    CONCLUSION**

For the foregoing reasons, the Court GRANTS the Commissioner's motion for judgment, ECF No. 12, and DENIES Kameisha's motion to reverse the hearing officer's decision or remand for further hearing, ECF No. 11.

**SO ORDERED.**


Dated: April 3, 2015                         _/s/ William G. Young_
                                             WILLIAM G. YOUNG
                                             DISTRICT JUDGE